*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ANDREW MICHAEL CZARNECKI,

Defendant-Appellant.

UNPUBLISHED
June 10, 2021

No. 348732
Wayne Circuit Court
LC No. 16-010813-01-FC

Before: O'BRIEN, P.J., and STEPHENS and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals as of right his convictions, following a jury trial, of first-degree premeditated murder, MCL 750.316(1)(a), armed robbery, MCL 750.529, and mutilation of a dead body, MCL 750.160.[1] Defendant was sentenced to a term of life imprisonment without parole for the first-degree murder conviction, 11 to 20 years' imprisonment for the armed robbery conviction, and 4½ to 10 years' imprisonment for the mutilation of a dead body conviction, to be served concurrently. We affirm.

## I. BACKGROUND

Defendant's convictions arise from the robbery and killing of Gavino Hernandez Rodriguez, who went missing on July 10, 2013. Rodriguez left for work on the morning of July 10, 2013, and never returned home. Rodriguez was driving a Pontiac G6 that belonged to his wife's uncle. On July 12, 2013, the Pontiac G6 was found on Florida Street in southwest Detroit. Blood was discovered on several areas of the car, including in the trunk. On July 20, 2013, Rodriguez's charred remains were discovered in a vacant area in southwest Detroit. Because the body was so badly burned, the medical examiner was unable to determine a cause of death. However, the examiner discovered that Rodriguez's hyoid bone was fractured, and stains on the

---

[1] The jury acquitted defendant of an additional charge of carjacking, MCL 750.529a. The jury also convicted defendant of an additional alternative charge of first-degree felony murder, MCL 750.316(1)(b), but the trial court vacated that conviction at sentencing.

fracture suggested that the fracture occurred at or near the time of his death. The type of fracture was consistent with strangulation or a blow to the neck. DNA testing of blood samples collected from the wheel well in the trunk of the Pontiac G6 matched Rodriguez's DNA profile. Latent fingerprints found on the trunk of the Pontiac G6 matched defendant's prints.

The prosecution's theory of the case was that defendant and Hameer Alkotiat jointly participated in the killing of Rodriguez to take his Pontiac G6, and then disposed of his body in a vacant area of southwest Detroit, where defendant set the body on fire. The prosecution's key witness, Robert Bonas, testified that he often spent time with defendant and Alkotiat, whose nickname is "Moose." Bonas claimed that the three of them were together in the early morning hours of July 11, 2013, when defendant and Alkotiat both recounted to Bonas how they had beaten Rodriguez by wrapping a chain around his neck, pulling him to the ground, and repeatedly kicking him, and then defendant struck Rodriguez over the head with a heavy metal object that looked like a Christmas tree stand. They explained that after Rodriguez was dead, they wrapped his body in sheets, placed the body in the trunk of the Pontiac G6, and drove to a nearby vacant area where they dumped the body and set it on fire.

The prosecution presented evidence of forensic cell phone record analysis to show communications between Rodriguez's and defendant's cell phones on the afternoon of July 10, 2013, and in the weeks leading up to that day. Records also showed that both cell phones interacted with the same cell tower in the area of defendant's southwest Detroit neighborhood in the late afternoon on July 10, 2013, that Rodriguez's phone went "dark" later that evening (meaning there was no more outgoing activity), and that during the early morning hours of July 11, 2013, defendant's cell phone interacted with a cell tower in the area where Rodriguez's body was discovered.

Defendant and Alkotiat were originally scheduled to be tried jointly, but on the eve of trial, the court adjourned Alkotiat's trial because of unanticipated medical issues with his attorney. Therefore, the trial proceeded against defendant only.[2] The defense theory at trial was that "there is no doubt in our minds . . . that Mr. Bonas participated in this homicide with Moose." The jury found defendant guilty of first-degree premeditated murder, armed robbery, and mutilation of a dead body, but acquitted him of an additional count of carjacking.

## II. ADMISSIBILITY OF ALKOTIAT'S STATEMENTS TO BONAS

Defendant first argues that the trial court erred by allowing the prosecution to introduce Alkotiat's statements to Bonas under the hearsay exception for statements against the declarant's penal interest, MRE 804(b)(3). Defendant argues that the prosecution failed to establish that Alkotiat was unavailable to testify, which is a requirement for admissibility under MRE 804(b)(3). We disagree.

---

[2] Alkotiat later pleaded guilty to second-degree murder, MCL 750.317, and was sentenced to a prison term of 18 to 20 years.

## A. PRESERVATION OF ISSUE AND STANDARD OF REVIEW

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Aldrich*, 246 Mich App 101, 116; 631 NW2d 67 (2001). The admissibility of Alkotiat's statements to Bonas was addressed in a pretrial motion in limine. The trial court ruled that the statements were admissible. Although defendant argued that Alkotiat's statements did not meet the requirements for admissibility under MRE 804(b)(3) and that admission of the statements would violate defendant's right of confrontation, defendant did not argue that Alkotiat was not an unavailable witness under MRE 804(a). Therefore, defendant's appellate argument is unpreserved. Accordingly, we review this issue for plain error affecting defendant's substantial rights. *People v Knox*, 469 Mich 502, 508; 674 NW2d 366 (2004); *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

## B. ANALYSIS

The parties do not dispute that Alkotiat's statements to Bonas are hearsay. MRE 801(c) provides that " 'hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Under MRE 802, hearsay is not admissible unless specifically provided for by the rules of evidence. In this case, Alkotiat's statements were offered under MRE 804(b)(3) (statements against interest). That exception is applicable only if the declarant is unavailable. MRE 804 provides, in pertinent part:

> **(a) Definition of Unavailability**. "Unavailability as a witness" includes situations in which the declarant--

> (1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement[.]

> \* \* \*

> **(b) Hearsay Exceptions**. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

> \* \* \*

> (3) *Statement Against Interest*. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Defendant does not argue that Alkotiat's statements to Bonas do not qualify as statements against interest under MRE 804(b)(3). Rather, he argues only that the statements were not admissible

under that exception because it was not demonstrated that Alkotiat was unavailable as a witness. We disagree.

The record discloses that defendant and Alkotiat were both charged in this matter. They were scheduled to be tried jointly, but on the eve of trial the court agreed to adjourn Alkotiat's trial because of some unanticipated medical issues involving Alkotiat's attorney. Therefore, trial proceeded against defendant only. When the admissibility of Alkotiat's statements to Bonas was revisited on the first day of trial, the issue of Alkotiat's unavailability was neither discussed nor contested. In his opening statement, defense counsel informed the jury that Alkotiat was "a person who was involved in this homicide," but explained that Alkotiat was being tried separately and would not be present at defendant's trial.

In *People v Meredith*, 459 Mich 62, 65-66; 586 NW2d 538 (1998), our Supreme Court recognized that a witness who relies on the Fifth Amendment to avoid testifying at trial is unavailable under MRE 804(a). The Court explained:

> While invocation of the Fifth Amendment is not expressly treated in MRE 804(a) it is of the same character as the other situations outlined in the subrule. Further, while "unavailability" is a term of art under MRE 804(a), it also bears a close nexus to the ordinary meaning of the word. *Thus we often have recognized that a witness, in fact, is unavailable who cites the Fifth Amendment as a justification for not testifying*. [*Meredith*, 459 Mich at 66 (emphasis added).]

Although defendant complains that the prosecutor never demonstrated that Alkotiat was an unavailable witness for purposes of MRE 804(a), it is apparent from the record that Alkotiat was unavailable because he was a codefendant in this case who was still awaiting trial. Indeed, defense counsel noted in his opening statement that Alkotiat was "involved in this homicide," but would not be present at defendant's trial because he was being tried separately. Because of Alkotiat's Fifth Amendment right against self-incrimination, the prosecution could not have called him as a witness and compelled his testimony. Moreover, defendant failed to object on grounds that the prosecution did not establish Alkotiat's unavailability, so the prosecution did not have the opportunity to fully develop this issue. Under these circumstances, and without any indication in the record otherwise suggesting that Alkotiat was willing or expected to testify, defendant has not demonstrated that the admission of Alkotiat's statements under MRE 804(b)(3) can be considered plain error for the reason that it was not demonstrated that Alkotiat was an unavailable witness under MRE 804(a).

## III. TEXT MESSAGE EVIDENCE

Defendant next argues that the trial court erred by admitting text-message evidence at trial. The prosecution offered the text messages as evidence of Rodriguez's communications with both defendant and Alkotiat during the weeks leading up to and on the day of Rodriguez's disappearance. Defendant argues that the prosecution failed to establish a sufficient foundation for admitting the text messages because it failed to demonstrate that the messages that Rodriguez sent and received involved communications with Alkotiat and defendant. We disagree.

We review a trial court's decision regarding the admission of evidence for an abuse of discretion. *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011). A court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*.

MRE 901(a) provides:

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

In *Mitchell v Kalamazoo Anesthesiology, PC*, 321 Mich App 144, 154; 908 NW2d 319 (2017), this Court explained that there are two discrete questions related to the challenge of evidence on the basis of its authenticity:

In Michigan, challenges to the authenticity of evidence involve two related, but distinct, questions. The first question is whether the evidence has been *authenticated*—whether there is sufficient reason to believe that the evidence is what its proponent claims for purposes of admission into evidence. The second question is whether the evidence is actually *authentic or genuine*—whether the evidence is, in fact, what its proponent claims for purposes of evidentiary weight and reliability.

The first question is reserved to the trial court, and as the evidentiary gatekeeper, it must decide whether evidence was presented to support a conclusion that the evidence is what the proponent asserts it is. *Id*. at 155. There is no one particular way for the proponent to meet this burden, and "evidence supporting authentication may be direct or circumstantial and need not be free of all doubt." *Id*. This Court further explained the process underlying the authentication of evidence by the trial court as follows:

Michigan courts have interpreted MRE 901(a) as requiring the proponent only to make a prima facie showing that a reasonable juror might conclude that the proffered evidence is what the proponent claims it to be. See *Mitchell*, 37 Mich App at 355-356. See also Gillespie, Michigan Criminal Law & Procedure, Practice Desk Book (2d ed.), § 9.2, p 472 ("[T]he question of admissibility turns on an initial decision by the court that a reasonable juror might find for the proponent on the question."). Once the proponent of the evidence has made the prima facie showing, the evidence is authenticated under MRE 901(a) and may be submitted to the jury. See *Mitchell*, 37 Mich App at 356. At this first stage, the opponent may oppose authentication by arguing that a reasonable juror could not conclude that the proffered evidence is what the proponent claims it to be. [*Mitchell*, 321 Mich App at 155.]

Under MRE 901(a), the prosecution was required to present evidence to support a finding that the text messages in question were what the prosecution claimed them to be, namely, communications between Rodriguez and both Alkotiat and defendant. Evidence at trial established that the phone numbers that Rodriguez sent his messages to, and received messages from, were numbers associated with Alkotiat and defendant. Further, in the text messages themselves, the

-5-

senders of the messages identified themselves as Moose (Alkotiat's nickname) and Drew (a name defendant used), and Rodriguez likewise referred to the recipients by these names. This evidence was sufficient to support a finding that the matters in question (Rodriguez's text-message exchanges) were what the prosecution claimed them to be (communications between Rodriguez and both defendant and Alkotiat). To the extent that there were any factual issues involving the identities of the persons whom Rodriguez was communicating with, those issues were to be resolved by the jury. *Mitchell*, 321 Mich App at 154; see also *People v Anderson*, 322 Mich App 622, 632; 912 NW2d 607 (2018) (explaining that it is for the jury to determine questions of fact); *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008) (explaining that it is the jury's role to weigh the evidence presented at trial).

## IV. JUDICIAL MISCONDUCT

Defendant next argues that the trial court's conduct throughout trial pierced the veil of judicial impartiality and thereby denied him a fair trial. We disagree.

### A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

To preserve a claim of judicial bias or misconduct, a defendant is required to raise the claim in the trial court. *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011); MCR 2.003(B). Because defendant did not object to any of the challenged conduct on the basis that the court pierced the veil of judicial impartiality, his claims of judicial misconduct are not preserved.

In *People v Swilley*, 504 Mich 350, 370; 934 NW2d 771 (2019), our Supreme Court explained:

> The question whether a judge's conduct has "denied a defendant a fair trial is a question of constitutional law that this Court reviews de novo." [*People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015)]. "When the issue is preserved and a reviewing court determines that the trial judge's conduct pierced the veil of judicial impartiality, the court may not apply harmless-error review." *Id.* at 164. Rather, "once a reviewing court has concluded that judicial misconduct has denied the defendant a fair trial, a structural error has occurred and automatic reversal is required." *Id.* at 168, citing *Arizona v Fulminante*, 499 US 279, 309; 111 S Ct 1246; 113 L Ed 2d 302 (1991).

However, unpreserved claims of judicial misconduct are reviewed for plain error affecting substantial rights. *Jackson*, 292 Mich App at 597. As this Court explained in *People v Cooper*, 309 Mich App 74, 88; 867 NW2d 452 (2015):

> A plain error is one that is "clear or obvious," and the error must affect the defendant's "substantial rights." *Carines*, 460 Mich at 763. That is, the defendant must have been prejudiced by the plain error. *Id.* "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of defendant's innocence." *Id.* at 763 (citation and quotation marks omitted; alteration in original).

## B. ANALYSIS

In determining whether a trial judge's conduct deprived a defendant of a fair and impartial trial, the pivotal inquiry is whether the judge's conduct pierced the veil of judicial impartiality. S*willey*, 504 Mich at 370. "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Stevens*, 498 Mich at 171. This inquiry is dependent on the facts of each case and requires a weighing of the following factors:

> the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial. [*Swilley*, 504 Mich at 371.]

This list is nonexhaustive and other factors may also be considered as relevant. *Id.* It is not necessary that every factor weigh in favor of a determination of impermissible partiality for a reviewing court to conclude that the judge's conduct improperly influenced the jury—the standard for reviewing courts is to consider a court's conduct under the totality of the circumstances. *Id.* Therefore, a court should not evaluate errors standing alone, but must consider the cumulative impact of the errors. *Id.*

## 1. THE NATURE OF THE TRIAL COURT'S CONDUCT

We first consider the nature of the trial court's conduct because this is "the starting point to evaluate whether the conduct overstepped the line of judicial impartiality." *Stevens*, 498 Mich at 173. In *Swilley*, 504 Mich at 371-372, the Court discussed the type of conduct that can pierce the veil of judicial impartiality and be reasonably likely to improperly influence a jury:

> Improper judicial conduct may come in many forms, including belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to a particular side, biased commentary in front of the jury, or a variety of other inappropriate actions. [Quotation marks and citation omitted.]

The majority of defendant's challenges to the trial court's conduct involve the court's interference with defense counsel's questioning of witnesses. As our Supreme Court observed, "undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on the judge's part toward witnesses . . . may tend to prevent the proper presentation of the cause, or the ascertainment of truth in respect thereto." *Stevens*, 498 Mich at 174.

Initially, while defendant accuses the trial court of "targeting defense counsel's ability to cross-examine key witnesses," the record does not support this assertion. With respect to defense counsel's questioning of (1) Dr. Gary Berman regarding an alleged inconsistency in Dr. Wornick's report, and (2) Captain Winston Farrow regarding his admittedly prior incorrect testimony, the trial court's conduct was aimed at limiting defense counsel's belaboring cross-examination on points that were not materially relevant to issues at trial. The alleged inconsistences in Dr.

Wornick's report, and any inaccuracy with respect to whether Captain Farrow observed a body when he visited the scene, were not materially relevant to a determination of defendant's guilt or innocence of the charged offenses. Notably, the trial court did not foreclose questioning on these subjects, but only acted to limit defense counsel's cross-examination when it became repetitive. With regard to the trial court's rulings on the prosecutor's objections that defense counsel's questioning of Bonas and Sergeant Wight was argumentative, the trial court, rather than seeking to curtail or limit cross-examination of these witnesses, instead cautioned defense counsel not to advance defendant's theory of the case in his questioning of the witnesses. With both witnesses, defense counsel's questions had conveyed counsel's factual view of the evidence—that Bonas went to the location where Rodriguez's body was found to remove any incriminating evidence, and that Bonas had intentionally failed to lead the police to defendant's house where he claimed Rodriguez was killed because Bonas did not want the police to find any evidence there—so it was not inappropriate for the trial court to remind the jury that the statements of the attorneys were not evidence.

The trial court's challenged conduct did not involve belittling defense counsel or biased commentary in front of the jury. Rather, its conduct was within the scope of its authority to manage the trial in an orderly and expeditious fashion. The trial court is vested with the power and discretion to manage the conduct of the trial. *People v Conley*, 270 Mich App 301, 307; 715 NW2d 377 (2006). Accordingly, this factor weighs against concluding that the trial court's conduct pierced the veil of impartiality. *Swilley*, 504 Mich at 380.

## 2. THE TRIAL COURT'S TONE AND DEMEANOR

As recognized in *Stevens*, a jury will turn to the trial court for guidance and instruction, and therefore, the jury is susceptible to even the most minimal indication of bias or prejudice exhibited by the trial court. *Stevens*, 498 Mich at 174. Therefore, a trial court should refrain from expressing its own opinions about the parties, and it must be aware of not only the substance of its words, but the manner in which they are stated. *Id*. at 175; *Swilley*, 504 Mich at 381. Accordingly, the trial court must refrain from using a controversial tone. *Id*. While this Court is not able to experience the tone and demeanor of a trial court first hand, this Court can look to the words the court used to determine if they conveyed hostility, bias, or incredulity. *Stevens*, 498 Mich at 176.

Having reviewed all of the examples cited by defendant, particularly in the context of the trial, we are satisfied that the trial court's choice of words did not convey hostility, bias, or incredulity with regard to defense counsel or defendant. In support of his contention that the trial court exhibited hostility toward him and defense counsel, defendant points to the trial court's repeated comments that "we're done" when precluding defense counsel from continuing to question Captain Farrow. While the trial court appeared impatient during this instance and during counsel's questioning of Dr. Berman, this impatience stemmed from defense counsel's repeated pursuit of lines of questioning that did not bear on the credibility of the witness or on defendant's guilt or innocence. More significantly, the trial court's conduct during these exchanges did not exhibit bias or prejudice against defendant or his counsel, or partiality in favor of the prosecution. Therefore, this factor also weighs against concluding that the trial court pierced the veil of judicial impartiality. *Swilley*, 504 Mich at 386.

### 3. THE SCOPE OF THE JUDICIAL INTERVENTION WITHIN THE CONTEXT OF THE LENGTH AND COMPLEXITY OF THE TRIAL

In *Stevens*, 498 Mich at 176, the Supreme Court observed that in a longer trial, or one that involves more complicated issues, "it may be more appropriate for a judge to intervene a greater number of times than in a shorter or more straightforward trial." In *Swilley*, 504 Mich at 386-387, the Court further explained that "the focus is not solely on whether the trial itself was long or complicated," and that in addition to considering whether the trial itself was lengthy or involved complicated issues, "[a] reviewing court must also evaluate the complexity of the particular issues that were subject to judicial inquiry."

In the present case, the record reflects that the trial court injected itself into the proceedings on occasions when defense counsel was belaboring points that were not materially relevant to the issues at trial. In these instances, the court allowed defense counsel to make his point and only restricted counsel from needlessly belaboring the points. The trial court also intervened when defense counsel advanced defendant's views of the evidence and theory of the case while questioning Bonas and Sergeant Wight. Notably, these interventions were prompted by objections by the prosecutor, which required the court to respond. Given these circumstances and considered in the context of the entire trial, the trial court's scope of intervention was not unreasonable. Therefore, this factor also weighs against concluding that the trial court pierced the veil of judicial impartiality. *Id*. at 386.

### 4. THE EXTENT TO WHICH THE TRIAL COURT'S COMMENTS WERE DIRECTED AT ONE SIDE MORE THAN THE OTHER

A finding of judicial partiality is more likely if the frequency and manner of the court's conduct is not balanced between the parties. *Stevens*, 498 Mich at 176-177. An appellate court will not hesitate to reverse to allow for a new trial if the trial court's questions and comments " 'were such as to place his great influence on one side or the other in relation to issues which our law leaves to jury verdict.' " *Id*. at 177, quoting *People v Young*, 364 Mich 554, 558-559; 111 NW2d 870 (2015).

While defendant argues that the trial court's conduct was only "harmful to the defense," the record discloses that there were occasions when the court also cautioned the prosecutor about her conduct and questioning of witnesses. For example, during closing arguments, the trial court reminded the prosecutor to limit her arguments to the evidence presented during trial. Also, during the prosecutor's direct examination of Bonas, after defense counsel had raised an objection that the prosecutor was leading the witness, the court cautioned the prosecutor to not elicit testimony that had already been given. Later, when defense counsel raised a hearsay objection to Bonas's testimony, the trial court heard the objection and indicated that it would overrule the objection only "for the moment." During the prosecutor's questioning of Sergeant Wight, the court sustained defense counsel's objection that the prosecutor's questioning was "a little leading and a little argumentative." The trial court also interrupted the prosecutor when she attempted to have Sergeant Wight testify about the date of the preliminary examination, stating that the date of the hearing was a matter of record and the prosecutor could just state it for the record. Similarly, while the prosecutor questioned Sergeant Wight about a silver Jeep that was found at the location where Rodriguez's body was discovered, defense counsel objected that the questioning was leading, and

when the prosecutor attempted to rephrase its question, the trial court interrupted and told the prosecutor to "move on."

In our view, this sampling of the trial court's conduct demonstrates that the court was focused on managing the trial in an efficient and expeditious manner, and that the court directed its efforts at both the defense and the prosecution evenhandedly to move the proceedings along in an expeditious manner. See *Swilley*, 502 Mich at 389 (explaining that, in weighing this factor, a consideration is whether both the defense and prosecution were subjected to equal judicial treatment). Therefore, this factor weighs against a determination that the trial court pierced the veil of judicial impartiality.

### 5. THE PRESENCE OR ABSENCE OF A CURATIVE INSTRUCTION

Whether the trial court gave a curative instruction is a relevant consideration in determining whether the trial court exhibited impermissible advocacy and partiality to the jury. *Stevens*, 498 Mich at 177. As explained in *Stevens*:

> The model jury instructions—both for civil and criminal trials—emphasize that a judge's comments, rulings, and questions do not constitute evidence and that the jury should not attempt to discern the judge's personal opinion while considering the case. See M Civ JI 2.04(2)(b) and (c); M. Crim JI 2.4(1); M Crim JI 2.8. Additionally, during the course of a proceeding, a trial judge has the ability to issue a curative instruction immediately in response to conduct that could give rise to the appearance of bias. Because "[i]t is well established that jurors are presumed to follow their instructions," *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998), a curative instruction will often ensure a fair trial despite minor or brief inappropriate conduct. Depending on the circumstances, an immediate curative instruction may further alleviate any appearance of advocacy or partiality by the judge. [*Stevens*, 498 Mich at 177.]

However, there are circumstances when a trial court so oversteps the bounds of judicial impartiality that an instruction will not alleviate or eliminate the appearance of partiality impressed upon the jury. *Id.* at 177-178. This factor is considered against the backdrop of the totality of the circumstances, and is weighed in conjunction with the other factors. *Swilley*, 504 Mich at 390.

In its preliminary instructions to the jury, and again in its final instructions, the trial court advised the jury that its words were not meant to reflect its own opinions about the case, that its comments, questions, and rulings were not evidence, that the jury should disregard any perceived opinion of the court, and that the jury alone must decide the facts and render a verdict on the basis of the evidence. To the extent that some of the instances of the trial court's conduct could be considered inappropriate, they were not overtly so or excessive. Considering the trial court's conduct under the totality of the circumstances, the court's instructions were sufficient to protect defendant's right to a fair trial.

Accordingly, defendant has not demonstrated that the trial court's conduct at trial pierced the veil of judicial impartiality.

## V. DEFENDANT'S STANDARD 4 BRIEF

Defendant raises several additional issues in a pro se supplemental brief, filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4.

## A. SUFFICIENCY OF THE EVIDENCE

Defendant argues that the prosecution failed to present sufficient evidence to support his convictions of first-degree premeditated murder, armed robbery, and mutilation of a dead body. We disagree.

We review de novo a challenge to the sufficiency of the evidence presented at trial. *People v Baskerville*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 345403); slip op at 2. In *People v Williams*, 294 Mich App 461, 471; 811 NW2d 88 (2011), this Court explained:

> When reviewing a defendant's challenge to the sufficiency of the evidence, we review the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. A prosecutor need not present direct evidence of a defendant's guilt. Rather, circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime. [Citations, quotation marks and alteration omitted.]

This Court will draw all reasonable inferences and determine credibility in support of the jury's verdict. *Baskerville*, ___ Mich App at ___; slip op at 3. Any conflicts in the evidence will be resolved in favor of the prosecution. *Id.*

## 1. FIRST-DEGREE PREMEDITATED MURDER

"The elements of first-degree [premeditated] murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018) (citation and quotation marks omitted).

Defendant argues that the prosecution did not prove first-degree premeditated murder beyond a reasonable doubt because Bonas's testimony was not credible and because Dr. Schmidt could not state with certainty the cause of Rodriguez's death. We disagree. The reason that Dr. Schmidt could not determine the manner of death was because Rodriguez's body had been so badly burned. Dr. Schmidt testified, however, that Rodriguez's hyoid bone was fractured, which was consistent with strangulation or a significant blow to his neck, and this explanation was also consistent with Bonas's testimony that defendant and Alkotiat admitted placing a chain around Rodriguez's neck and pulling him to the ground. Bonas's testimony describing how defendant and Alkotiat both admitted killing Rodriguez was sufficient to enable the jury to find that defendant was the cause of Rodriguez's death. The credibility of Bonas's testimony was for the jury to resolve. *Baskerville*, ___ Mich App at ___; slip op at 3.

Defendant also argues that the prosecution did not prove that he intended to kill Rodriguez, or that the killing was premeditated and deliberate. We again disagree. "First-degree murder is a specific intent crime, which requires proof that the defendant had an intent to kill." *People v*

*Herndon*, 246 Mich App 371, 386; 633 NW2d 376 (2001). An intent to kill may be inferred by any facts in evidence, and minimal circumstantial evidence will suffice. *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008). Bonas testified that defendant admitted to him that he and Alkotiat became involved in a physical altercation with Rodriguez, during which Alkotiat placed a chain around Rodriguez's neck and pulled him to the ground, the two of them began kicking him, and then defendant struck Rodriguez in the head with a heavy piece of metal. According to Bonas, defendant showed him the piece of metal that he used to hit Rodriguez; it looked like a Christmas tree stand and defendant commented on how heavy it was. These facts were sufficient to support an inference that defendant intended to kill Rodriguez.

With regard to whether the killing was deliberate and premeditated, the Court in *Oros*, 502 Mich at 242-243, explained:

> Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a "second look." *People v Gonzalez*, 468 Mich 636, 641; 664 NW2d 159 (2003); *People v Tilley*, 405 Mich 38, 45; 273 NW2d 471 (1979). That is, "some time span between the initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation," but it is within the province of the fact-finder to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look. See *Gonzalez*, 468 Mich at 641 (quotation marks, brackets, and citation omitted).

In *People v Clark*, 330 Mich App 392, 437; 948 NW2d 604 (2019), this Court further explained:

> In proving an actor's state of mind, the jury may rely on circumstantial evidence and the reasonable inferences arising from that evidence; indeed, minimal circumstantial evidence is sufficient to establish that a defendant had the intent to kill and proceeded with deliberation and premeditation. The prosecutor may establish premeditation and deliberation through evidence of the parties' prior relationship, the defendant's actions before the killing, the circumstances surrounding the killing itself, or the defendant's conduct after the killing. [Citations omitted.]

While defendant and Alkotiat stated that the confrontation that led to Rodriguez's death began when Rodriguez attempted to grab defendant's penis, defendant's and Alkotiat's admissions described a brutal assault, which involved dragging Rodriguez to the floor with a chain, kicking him, and then defendant hitting him in the head with a heavy metal object. Moreover, according to defendant's admissions, Rodriguez was already disabled and on the ground when defendant hit him in the head with the metal object, which permitted the jury to infer that defendant had an opportunity to deliberate and reconsider his actions before he struck Rodriguez. Additionally, Bonas explained at trial that Alkotiat had formulated a plan to rob Rodriguez of the Pontiac G6, and cell phone records indicated that both defendant and Alkotiat communicated with Rodriguez by text message on and before July 10, 2013. The jury could reasonably infer from this evidence that defendant and Alkotiat participated in a scheme to manipulate Rodriguez into meeting with them under the guise of hanging out while planning to kill him and steal his car. Accordingly,

there was sufficient evidence that defendant acted with premeditation and deliberation. Although defendant complains that the prosecution did not establish with clarity who actually killed Rodriguez, the prosecution proceeded against defendant at trial as both a principal and an aider or abettor, and a person who aids or abets an offense may be convicted "as if he had directly committed such offense." MCL 767.39.

Defendant also claims that the prosecution failed to prove beyond a reasonable doubt that the killing of Rodriguez was not justified. Although it is necessary to prove that a killing was not justified to prove second-degree murder, see *People v Roper*, 286 Mich App 77, 84; 777 NW2d 483 (2009), there is no similar requirement for first-degree murder. The trial court instructed the jury on the lesser offense of second-degree murder (including the requirement "that the killing was not justified"), but the jury rejected that option and instead found defendant guilty of first-degree premeditated murder.

For these reasons, we reject defendant's challenges to the sufficiency of the evidence in support of his conviction of first-degree premeditated murder.

## 2. ARMED ROBBERY

Defendant also argues that the prosecution failed to present sufficient evidence to convict him of armed robbery. We again disagree.

To prove the offense of armed robbery, the prosecution was required to prove:

(1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Muhammad*, 326 Mich App 40, 61; 931 NW2d 20 (2018) (quotation marks and citation omitted).]

Defendant claims that the prosecution did not establish that (1) he used force or violence against Rodriguez, or assaulted Rodriguez or put him in fear, (2) during the commission of a larceny, and (3) while possessing a dangerous weapon. The evidence, viewed in the light most favorable to the prosecution, *Williams*, 294 Mich App at 471, belies defendant's contentions. First, Bonas's testimony describing how defendant and Alkotiat violently assaulted Rodriguez by pulling him to the ground with a chain, repeatedly kicking him, and then defendant using a heavy metal object to hit Rodriguez in the head provided ample evidence that defendant used force or violence against Rodriguez, or assaulted or put Rodriguez in fear. *Muhammad*, 326 Mich App at 61. Second, the evidence that defendant used a heavy metal object to strike Rodriguez was sufficient to support a finding that defendant used an article fashioned as a dangerous weapon during the assault. Third, the evidence also supported a finding that the assault occurred in the course of committing a larceny of the Pontiac G6. Bonas testified that (1) defendant told him that he killed someone for the car, (2) defendant was driving Rodriguez's Pontiac G6 in the time period

-13-

immediately following Rodriguez's disappearance, and (3) defendant was also in possession of the keys to the car. Defendant's fingerprints were also found on the car. While defendant claims that it was Alkotiat who intended to rob Rodriguez of the Pontiac G6 and that defendant did not have any knowledge of Alkotiat's intentions, the jury could reasonably infer from the evidence of defendant's active participation in the assault against Rodriguez and from defendant's possession of the keys and the vehicle in the period following Rodriguez's disappearance that defendant knowingly participated in the robbery of Rodriguez, and was guilty as either a direct principal or as an aider or abettor.

Defendant also argues that the prosecution did not prove that Rodriguez was present during the commission of the larceny because there was no evidence that Rodriguez was in defendant's home, and the cell phone evidence only placed Rodriguez in the area of Michigan and Lonyo, not at defendant's home. Defendant ignores that the cell phone evidence nevertheless supported a finding that Rodriguez and defendant were in the same area at the time of Rodriguez's disappearance. While the cell phone evidence alone did not establish that defendant and Rodriguez were together, Bonas's testimony about defendant's and Alkotiat's admissions permitted the jury to find that defendant and Rodriguez met in person, leading to the attack and robbery.

Finally, while defendant asserts that there was no evidence of an aggravated or serious injury to Rodriguez, this is factually inaccurate given that Rodriguez was killed. More significantly, however, whether Rodriguez suffered a serious injury is not legally relevant. MCL 750.529 does not require that a robbery victim sustain an aggravated or serious injury. The jury was only required to find that, in the course of committing a larceny, defendant used force or violence against Rodriguez, or assaulted him and put him in fear, while in possession of a dangerous weapon. *Muhammad*, 326 Mich App at 61. As explained, ample evidence was presented to support these elements.

### 3. MUTILATION OF A DEAD BODY

Defendant argues that the evidence was insufficient to convict him of mutilation of a dead body because the only evidence supporting the commission of this crime was the testimony of Bonas, who was not credible. We disagree.

"A defendant is guilty of mutilation of a human body under MCL 750.160 if the defendant (1) without any legal authorization to do so, (2) causes permanent damage to a portion of a dead body, defaces a portion of a dead body by marring its appearance, or removes or carries away from the whole a portion of a dead body." *People v Bass*, 317 Mich App 241, 271; 893 NW2d 140 (2016). Rodriguez's body had been badly burned and Bonas testified that defendant admitted killing Rodriguez and then using starter fluid to light Rodriguez's body on fire. This evidence was sufficient to prove that defendant, without legal authorization, caused permanent damage to and defaced Rodriguez's dead body. The thrust of defendant's argument is that Bonas's testimony was not credible. Defendant suggests that it was actually Bonas who was involved in the robbery and murder of Rodriguez. In *Baskerville*, ___ Mich App at ___; slip op at 3, this Court explained:

> [A]lthough it is sometimes appropriate for a court to remove a credibility
> assessment from the jury's consideration, such circumstances are extremely rare
> and require testimony that borders on being impossible. Otherwise, only the jury

-14-

may determine the credibility of a witness or the weight to be afforded any evidence, and it may convict a defendant based solely on the testimony of an accomplice. [T]he credibility of witnesses is a matter of weight, not sufficiency. [Quotations marks and citation omitted.]

The testimony of Bonas did not "border[] on being impossible." *Id*. On the contrary, key portions of Bonas's testimony was corroborated by other evidence. For instance, there was cell phone evidence substantiating defendant's and Alkotiat's history of communications with Rodriguez, and cell phone evidence placing (1) defendant and Rodriguez in the same area at the time of Rodriguez's disappearance and (2) defendant near the location of Rodriguez's body and the location where the police discovered the Pontiac G6. Moreover, the medical evidence showed that Rodriguez's hyoid bone was fractured, which was consistent with Bonas's description of a chain being placed around Rodriquez's neck to pull him to the ground. Further, Bonas testified that defendant and Alkotiat told him that they wrapped Rodriguez's body in a sheet and placed it in the trunk of the Pontiac G6. The police discovered blood in the trunk that matched Rodriquez's DNA profile. According to Bonas, defendant also told him that he doused Rodriguez's body with starter fluid and lit it on fire, and Rodriquez's body had been badly burned when it was discovered. In sum, there is no basis for this Court to substitute its judgment for that of the jury regarding Bonas's credibility. The evidence was sufficient to support defendant's conviction of mutilation of a dead body.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant raises several claims of ineffective assistance of counsel, all of which are without merit.

Because this Court denied defendant's motion to remand, our review of his ineffective-assistance claims is limited to errors apparent from the record. *People v Foster*, 319 Mich App 365, 390; 901 NW2d 127 (2017). Whether a defendant received the effective assistance of counsel is a mixed question of law and fact. *People v Ackley*, 497 Mich 381, 388; 870 NW2d 858 (2015). As our Supreme Court explained in *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018):

Under *Strickland v Washington*, [466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984),] establishing ineffective assistance requires a defendant to show (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant. Prejudice means a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Quotation marks omitted.]

This Court reviews trial counsel's performance against the presumption that trial counsel's performance was effective, and the onus falls on the defendant to overcome "the strong presumption" that trial counsel's challenged actions resulted from sound trial strategy. *Cooper*, 309 Mich App at 80. This Court will refrain from second-guessing trial counsel's performance with the benefit of hindsight. *People v Rosa*, 322 Mich App 726, 742; 913 NW2d 392 (2018). The defendant is responsible for establishing the factual predicate of his claim. *Anderson*, 322 Mich App at 628.

## 1. FAILURE TO IMPEACH BONAS WITH HIS PRIOR TESTIMONY?

Defendant first argues that trial counsel performed deficiently by failing to impeach Bonas with his prior testimony at an investigative-subpoena proceeding that he had been in the area of defendant's home earlier in the day before Rodriguez disappeared. Defendant also faults trial counsel for not impeaching Bonas with his preliminary examination testimony that, at the time Rodriguez disappeared, he was using three different cell phones.

At trial, Bonas testified that he met up with defendant and Alkotiat in southwest Detroit at 2:00 or 3:00 a.m. on July 11, 2013. Defendant argues that defense counsel performed deficiently by failing to impeach this timeline with evidence that Bonas testified at the prior investigative-subpoena proceeding that he drove to defendant's southwest Detroit neighborhood between 7:00 p.m. and 10:00 p.m. on July 10, 2013, but visited another friend first before going to hang out with defendant and Alkotiat, and the trio left the Pontiac G6 on Florida Street before midnight. On appeal, defendant has not produced Bonas's investigative-subpoena testimony. Defendant has therefore failed to establish the factual predicate of his claim and is not entitled not relief.

Turning to defendant's challenge to Bonas's multiple-cell-phone testimony, at defendant's preliminary examination, Bonas testified that he gave the police three cell phone numbers that he may have been using in July 2013, but he was not sure which phone he was using at the time. One of those numbers, which ended in 6042, was a prepaid cell phone. Although defendant complains that trial counsel performed deficiently by not impeaching Bonas with his preliminary examination testimony about being unsure which cell phone he was using at the time of Rodriguez's disappearance, Bonas gave similar testimony at trial that he could not recall the phone number that he was using in July 2013. He acknowledged, however, that he gave a statement to the police on July 21, 2013, and at that time he gave the police the 6042 number. After reviewing his police statement at trial, he agreed that he was using the 6042 number during the time period relevant to this case. Sergeant Wight likewise confirmed that Bonas identified the 6042 number as his phone number when he gave his police statement. Although Bonas testified at the preliminary examination that he informed the police of three different phone numbers he may have been using, his actual statement referred to only the 6042 number. On cross-examination, trial counsel did question Bonas about whether he was using any other phone numbers in July 2013. Bonas initially responded, "No, I don't remember, no," but then admitted, "I may have." Although counsel did not ask Bonas specifically about the other numbers that he mentioned in his preliminary examination testimony, that decision was not objectively unreasonable in light of the evidence that only the 6042 number was mentioned in Bonas's police statement and that counsel was successful in eliciting Bonas's admission that he may have been using other numbers.

Defendant's assertion that he was prejudiced by counsel's failure to use Bonas's preliminary examination testimony about other cell phone numbers he may have been using in July 2013—because such testimony could have discredited the cell phone evidence that was presented at trial—is unpersuasive. Initially, such testimony would not have had any impact on the cell phone evidence that showed that Rodriquez's and defendant's cell phones were in the same area of defendant's neighborhood on the afternoon that Rodriguez disappeared, or the evidence that showed that after midnight on July 11, 2013, defendant's cell phone was in the same area where Rodriguez's body was discovered. The preliminary examination testimony also would not have discredited the evidence showing that the cell phone associated with the 6042 number was

not in the Detroit area on the afternoon of July 10 or shortly after midnight on July 11. At most, it may have allowed the jury to find that Bonas was using a different cell phone on July 10, 2013, and therefore, the cell phone mapping evidence associated with the 6042 number did not reliably establish Bonas's actual locations on those dates. As noted, however, defense counsel successfully elicited Bonas's admission that he may have been using other cell phones in July 2013. The jury was free to rely on that admission to discount the reliability of the 6042 number as a basis for tracking Bonas's location in July 2013. Because the preliminary examination testimony would have served that same purpose, defendant has not established that he was prejudiced by counsel's failure to use the preliminary examination testimony at trial.

## 2. COUNSEL'S CROSS-EXAMINATION OF BONAS

Defendant next argues that trial counsel performed deficiently because he did not question Bonas about his inability to identify defendant's home only days after the alleged crimes. Defendant also criticizes trial counsel for not questioning Bonas about being "forced" to testify by the prosecution, or about whether Bonas was facing serious charges in an unrelated case and may have agreed to testify in this case in exchange for dismissal of these charges. The record does not support any of these claims.

At trial, Sergeant Wight testified that after Bonas gave his police statement, the two of them drove to defendant's neighborhood, and Sergeant Wight asked Bonas to point out defendant's house. Bonas pointed to some similar looking houses, but was not able to specifically identify defendant's home. On cross-examination, defense counsel questioned Bonas about the address of defendant's home, and Bonas admitted that he could not recall the address. Throughout his cross-examination of Bonas, trial counsel questioned Bonas in a manner clearly intended to impeach his credibility by (1) suggesting that it was Bonas who was involved in Rodriguez's robbery and homicide, (2) highlighting the amount of marijuana and alcohol Bonas had consumed, both while with Alkotiat and defendant as well as before he met up with them in the early morning hours of July 11, 2013, and (3) questioning his failure to call the police after defendant and Alkotiat confessed to killing Rodriguez. Moreover, during closing argument, defense counsel seized upon the evidence that Bonas failed to positively identify defendant's house to Sergeant Wight by suggesting that Bonas did so intentionally because he was worried that the police might find evidence there linking him to Rodriguez's death. Counsel argued:

> [Sergeant Wight] says take me to where [defendant] lives. Now this gets very interesting. Because they go to a general neighborhood. It may be that house or it may be that house. Or it may be that house. I am not sure. I am not sure. Although we don't have enough to go inside these houses. Oh, it would be very difficult to get a search warrant to go into these houses. Really?

> *  *  *

> Why is it that Bonas committed this homicide that he doesn't want anybody to know where it occurred? Because you just might recover the tree stand, that was used by Bonas to hit the person in the head with his fingerprints on it. Do you remember how this all got started? He ran to the police because he was afraid his fingerprints would be found on it. And that's the last item in the world that Bonas

-17-

> wanted the police to recover is that tree stand, probably with the deceased blood on
> it, and probably with fingerprints on it. And that's why he played this game with
> the officer in charge.

In sum, while defense counsel may not have questioned Bonas in the manner preferred by defendant, the record discloses that counsel did question Bonas about his familiarity with defendant's house, the jury was aware that Bonas had failed to positively identify defendant's house to Sergeant Wight, and defense counsel seized on this evidence to argue that it supported the defense theory that Bonas was a participant in this offense. Defendant has not overcome the presumption that trial counsel's handling of this issue was sound trial strategy, *Cooper*, 309 Mich App at 80, or demonstrated that counsel's performance fell below an objective standard of reasonableness.

Defendant also argues that trial counsel was ineffective for not cross-examining Bonas about being coerced to testify, or questioning him about other criminal charges he was facing. Again, the record does not support defendant's argument that counsel performed deficiently. The record reveals that, on cross-examination, defense counsel questioned Bonas about his motives for going to the police, his admitted reluctance to testify, and his reasons for securing the representation of counsel. On redirect examination, Bonas commented that he sought legal representation "pretty much when I was being forced to testify." Defense counsel also inquired of Bonas whether he was facing any charges related to this case, or whether he anticipated that the prosecution would file any such charges following his testimony.

Defendant has attached to his Standard 4 brief a copy of the register of actions in an unrelated case, which indicates that on September 13, 2013, Bonas was charged with carjacking, MCL 750.529a, armed robbery, MCL 750.529, and felonious assault, MCL 750.82, but defendant does not provide any information regarding the disposition of these charges. Throughout Bonas's testimony, on both direct and cross-examination, there was no indication that he was testifying under any agreement with the prosecution relating to either this case or some other case, and no evidence to the contrary has been presented. Given that trial counsel extensively and thoroughly questioned Bonas regarding his reasons for (1) reporting these crimes to the police, (2) cooperating with the prosecution, and (3) securing legal counsel, and there is no evidence that Bonas in fact testified pursuant to any agreement with the prosecution, there is no basis for concluding that trial counsel's questioning of Bonas was objectively unreasonable.

Further, with respect to any charges Bonas may have been facing in other cases, defendant has not demonstrated that such evidence would have been admissible. Evidence of a witness's prior arrests or charges for offenses that do not result in conviction generally is inadmissible for impeachment, *People v Falkner*, 389 Mich 682, 695; 209 NW2d 193 (1973), unless relevant to show bias or motive for testifying, *People v Layher*, 464 Mich 756, 767; 631 NW2d 281 (2001). Defendant has presented evidence that Bonas was charged in another matter, but he does not explain how this evidence was relevant to this case. There is no evidence that Bonas received any special consideration in any other matter because of his testimony in this case. Accordingly, defendant has not demonstrated that counsel was ineffective for failing to question Bonas about other criminal charges.

### 3. FAILURE TO OBJECT TO OFFICER KEVIN KING'S TESTIMONY

Defendant also argues that defense counsel was ineffective for not objecting to Officer King's testimony that he saw blood on the Pontiac G6. We disagree.

Contrary to what defendant argues, the record reflects that trial counsel did object to Officer King's characterization of the substance he observed in various areas of the Pontiac G6 as blood. Moreover, on cross-examination, counsel elicited testimony clarifying that Officer King could not positively identify the substance as blood, but only as suspected blood. Given these efforts, trial counsel's performance did not fall below an objective standard of reasonableness. Furthermore, defendant was not prejudiced by Officer King's testimony because additional evidence was presented that the substance collected from the Pontiac G6 was later tested and confirmed to be human blood, which matched Rodriguez's DNA profile.

We also reject any suggestion that Officer King's testimony allowed the prosecutor to argue in closing argument that defendant's fingerprints were found on the Pontiac G6, which also contained Rodriguez's blood. This argument was not dependent upon Officer King's testimony. Rather, it was supported by the testimony of other witnesses who testified that a fingerprint found on the Pontiac G6 matched defendant's print, and that the substance in the wheel well of the Pontiac G6 was tested and determined to be blood, which was consistent with Rodriguez's DNA profile. Therefore, defendant's claim of ineffective assistance of counsel as it relates to Officer King's testimony is without merit.

In sum, the record does not support defendant's multiple claims of ineffective assistance of counsel.

### C. PROSECUTORIAL MISCONDUCT

Defendant also raises several claims of prosecutorial misconduct, none of which were preserved with an appropriate objection at trial. We review unpreserved claims of prosecutorial misconduct for plain error affecting the defendant's substantial rights. *Clark*, 330 Mich App at 433.

This Court reviews claims of prosecutorial misconduct on a case-by-case basis by examining the record and evaluating the prosecution's remarks in context to determine whether the defendant was denied a fair and impartial trial. *People Caddell*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket Nos. 343750 & 343993); slip op at 22; *People v Jackson (On Reconsideration)*, 313 Mich App 409, 425-426; 884 NW2d 297 (2015). A prosecutor's comments must be evaluated "in light of defense counsel's arguments and the relationship of [the] comments to the admitted evidence." *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009). "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements." *Id*.

### 1. USE OF PERJURED TESTIMONY TO SECURE A CONVICTION

Defendant argues that the prosecution presented false testimony from Bonas with regard to the timeline of his whereabouts on July 10, 2013, and the early morning hours of July 11, 2013.

Defendant asserts that Bonas's trial testimony was false because it was inconsistent with testimony he gave during an investigative-subpoena proceeding on October 25, 2013.

In *Giglio v United States*, 405 US 150, 151-152; 92 S Ct 763; 31 L Ed 2d 104 (1972), the United States Supreme Court recognized that if a prosecutor acts to deliberately deceive the court and the jury by presenting evidence to the court and jury that it knows to be false, or allows false testimony to go uncorrected when it is put forth, such action or inaction is inconsistent with the basic requirements of due process. See also *Napue v Illinois*, 360 US 264, 267, 272; 79 S Ct 1173; 3 L Ed 2d 1217 (1959) (reversing a conviction where the prosecution used false testimony that "may have had an effect on the outcome of the trial"). This rule also applies to evidence that is relevant to the credibility of a witness. *People v Smith*, 498 Mich 470, 476; 870 NW2d 299 (2015).

As noted earlier, defendant has not provided a copy of Bonas's investigative-subpoena testimony. Therefore, he has not established factual support for his argument that Bonas's testimony at trial was inconsistent with his prior investigative-subpoena testimony. Even assuming, however, that Bonas's timeline testimony at the investigative-subpoena proceeding was inconsistent with his trial testimony, defendant would not be entitled to relief. The record reveals that Bonas admitted at trial that he was not sure of the exact time that he met up with defendant and Alkotiat, and that it was only after having an opportunity to review his cell phone records that he became aware that he did not arrive in southwest Detroit until the early morning hours of July 11, 2013. To the extent that Bonas's testimony at trial may have conflicted with testimony he gave at the prior investigative-subpoena proceeding, that alone does not demonstrate that his trial testimony was false, let alone that the prosecutor knew it was false. See, e.g., *Bass*, 317 Mich App at 275 (stating that "an inconsistent prior statement . . . is not definitive evidence that the trial testimony is false"). Indeed, cell phone mapping evidence for the cell phone that Bonas claimed he was using at the time of the offense corroborated his trial testimony regarding his travels on July 10 and July 11, 2013. Therefore, the prosecutor had an independent basis for believing that Bonas's trial testimony was true, and there is no basis for concluding that the prosecutor knowingly allowed Bonas to present false testimony at trial with respect to this matter. Accordingly, defendant has not established a plain error.

## 2. STATING FACTS NOT IN EVIDENCE

Defendant also argues that the prosecutor referenced facts not supported by the evidence in both her opening statement and closing argument. We disagree.

In *People v Johnson*, 315 Mich App 163, 199-201; 889 NW2d 513 (2016), this Court explained the duties of a prosecutor during opening statements and closing arguments:

> The appropriate time for a prosecutor to state what evidence will be submitted and what he intends to prove at trial is during opening statements. *People v Meissner*, 294 Mich App 438, 456; 812 NW2d 37 (2011). When a prosecutor states that evidence will be submitted, and the evidence is not presented, reversal is not warranted if the prosecutor did so acting in good faith. *People v Johnson*, 187 Mich App 621, 626; 468 NW2d 307 (1991). With regard to closing arguments, "[a] prosecutor may not make a factual statement to the jury that is not supported by the evidence," but a prosecutor "is free to argue the evidence and all reasonable

inferences arising from it as [it] relate[s] to . . . [the] theory of the case." *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007). Furthermore, a prosecutor may not inject into trial his personal beliefs or opinions of a defendant's guilt. *People v Ericksen*, 288 Mich App 192, 200; 793 NW2d 120 (2010).

Defendant first accuses the prosecutor of misrepresenting in both her opening statement and closing argument that "there was blood on the trunk where [defendant's] fingerprints were." Contrary to defendant's assertion, the prosecutor clearly stated in her opening statement that Rodriguez's blood was found "[i]n the wheel well" of the Pontiac G6, and defendant's fingerprints were found "on that trunk." These remarks were supported by the evidence presented at trial. In her closing argument, the prosecutor broadly referenced the victim's car as an object where both defendant's fingerprints and the victim's blood were found, which again was an accurate statement of the evidence presented at trial. Thus, there is no merit to this claim of prosecutorial misconduct.

Defendant next argues that the prosecutor, during closing argument, mischaracterized statements that defendant made during a recorded phone call from the county jail. The record reveals that two of defendant's recorded calls from jail were played at trial. In response to a request from this Court for the exhibit of those recorded calls, defendant submitted a flash exhibit drive containing more than 100 recorded calls that are not numbered or identifiable by date. Defendant did not identify the two calls that were played at trial and our efforts to identify the two calls have not been successful. Regardless, defendant is not entitled to relief. As noted, there was no objection to the prosecutor's characterization of defendant's statements during the recorded call. To the extent that the prosecutor may not have accurately characterized defendant's statements during that call, a curative instruction upon timely objection could have rectified any perceived prejudice. *People v Roscoe*, 303 Mich App 633, 649; 846 NW2d 402 (2014); *Seals*, 285 Mich App at 22. Even without an objection, the trial court instructed the jury that "the lawyers' statements and arguments are not evidence" and that the jury "should only accept things the lawyers have said that are supported by the evidence." This instruction was sufficient to protect defendant's substantial rights. Therefore, defendant is not entitled to relief with respect to this unpreserved claim of prosecutorial misconduct.

Defendant next argues that when discussing the offense of armed robbery to the jury, the prosecutor erroneously stated that the Pontiac G6, and the keys to the car, were taken by defendant from Rodriguez. We disagree. At trial, Rodriguez's wife testified that Rodriguez was driving the Pontiac G6 when he left for work on the morning of July 10, 2013. The vehicle was discovered two days later on Florida Street in southwest Detroit. Bonas testified that defendant and Alkotiat asked him to accompany them to drive the Pontiac G6 to Florida Street, and that defendant was driving the car and holding the keys. Defendant also told Bonas that he killed Rodriguez for the Pontiac G6. This evidence, and reasonable inferences arising from it, supported the prosecutor's statement that the evidence would show that defendant took the Pontiac G6 and its keys from Rodriguez.[3]

---

[3] Likewise, for the same reasons, and given Bonas's testimony regarding how defendant admitted to assaulting Rodriguez, defendant's challenge to the prosecutor's statement when arguing against

-21-

Defendant also argues that the prosecutor erroneously argued at trial that defendant intended to kill Rodriguez, that he used force to do so, and that he acted with premeditation. We again disagree. Bonas testified that Alkotiat had told him that weeks before Rodriguez was killed he met a man who drove a Pontiac G6 and he planned to rob him of the car. Alkotiat reminded Bonas of this earlier conversation on the night of Rodriguez's killing, and defendant was present during this conversation. And according to Bonas, both Alkotiat and defendant recounted how they had killed Rodriguez that night, explaining that Alkotiat wrapped a chain around Rodriguez's neck, pulled him to the ground, and Alkotiat and defendant both repeatedly kicked him, and then defendant grabbed a heavy metal object and struck Rodriguez in the head. Bonas also testified that defendant told him that "[defendant] got the car by killing somebody." Defendant and Alkotiat then took Rodriguez's body, covered in a sheet, to a nearby location and burned it using starter fluid. This evidence, and reasonable inferences arising from the evidence, supported the prosecutor's arguments that defendant intended to kill Rodriguez and did so with premeditation.[4]

To the extent that defendant also argues that trial counsel was ineffective for not objecting to the prosecutor's arguments, we reject this claim because the prosecutor's arguments were not improper and trial counsel was not required to raise a meritless objection. *Ericksen*, 288 Mich App at 201.

### 3. VOUCHING FOR CREDIBILITY

Defendant next argues that the prosecutor impermissibly vouched for the credibility of Bonas and the propriety of the police investigation during closing argument. We disagree.

A prosecutor is not permitted to vouch for the credibility of a witness by suggesting to the jury that the prosecution possesses special knowledge that the witness is testifying truthfully. *Clark*, 330 Mich App at 434. However, a prosecutor is not precluded from arguing based on the evidence that a witness is worthy of belief. *Id.*

After reviewing the prosecutor's challenged remarks, we conclude that the prosecutor did not impermissibly vouch for Bonas's credibility. The prosecutor's comments regarding Bonas's circumstances, including his consultation of friends and family members, the factors that made him decide to eventually go to the police, how he was treated after doing so, and the delays in prosecuting this case were all matters of evidence at trial and the prosecutor's statements were consistent with the trial testimony. The prosecutor did not suggest in any of the challenged remarks that she possessed special knowledge, unknown to the jury, that Bonas's testimony was truthful. Accordingly, defendant has not established that the prosecutor's remarks were improper.

---

a directed verdict motion that defendant used force to take the keys to the Pontiac G6 to rob Rodriguez of the car is also without merit.

[4] Similarly, defendant's contention that the prosecutor erroneously argued in response to defendant's motion for a directed verdict that defendant admitted using an object with force against Rodriguez is without merit, given Bonas's testimony that defendant told him that he used a heavy metal object to beat Rodriguez over the head.

Defendant also argues that the prosecutor improperly urged the jury to "take Bonas's word" regarding the circumstances of Rodriguez's killing, and mischaracterized the evidence when stating that defendant's statements during his own police interview corroborated Bonas's testimony. We again disagree.

The record discloses that the prosecutor argued to the jury, in reference to Bonas's testimony, that it was not required to merely take Bonas's word for it because other evidence corroborated many aspects of his testimony. Further, the prosecutor commented on defendant's statements during his recorded police interview, which we have reviewed. The prosecutor did not mischaracterize defendant's statements during that interview, which the prosecutor observed revealed many details that were consistent with the circumstances surrounding Rodriguez's killing as related by Bonas. The prosecutor was permitted to argue that the body of evidence presented at trial demonstrated that Bonas's testimony was credible and that defendant's statements during his recorded interview contained "kernels of truth" that demonstrated his participation in Rodriguez's death. Defendant has not established that these comments were improper.

Defendant also challenges several of the prosecutor's remarks during rebuttal argument. These remarks did not involve vouching for Bonas's credibility, but rather were responsive to defense counsel's attacks on Bonas's credibility and the competency of the police investigation. The prosecutor's remarks were supported by the evidence and, considered in the context of defense counsel's arguments, *Seals*, 285 Mich App at 22, were not improper.

In sum, defendant has not demonstrated any plain error involving the prosecutor's conduct at trial. Furthermore, having concluded that the prosecutor's remarks were not improper, we also reject defendant's related claim that trial counsel was ineffective for not objecting to the remarks. Counsel is not required to raise a meritless objection. *Ericksen*, 288 Mich App at 201.

## 4. ELICITING FALSE TESTIMONY FROM SERGEANT WIGHT

Finally, defendant argues that the prosecutor engaged in misconduct by failing to correct Sergeant Wight's false testimony that a telephone number ending in 0050 was for a phone registered to defendant. We disagree.

As defendant correctly recognizes, in *Smith*, 498 Mich at 475-476, our Supreme Court explained that "[i]t is inconsistent with due process when the prosecution allows false testimony from a state's witness to stand uncorrected," and the prosecutor is not permitted to knowingly use false testimony to obtain what will ultimately result in a tainted conviction. When false testimony is elicited, the prosecutor bears an affirmative duty to correct the false testimony, particularly if the testimony concerns any "remuneration for a witness's cooperation." *Id*. at 476. However, as the Court in *Smith* acknowledged, " 'not every contradiction is material,' " and the prosecution is not required to correct false or incorrect testimony every time it is elicited. *Id*. at 476, quoting *United States v Martin*, 59 F3d 767, 770 (CA 8, 1995). For due-process purposes, the pivotal inquiry is the impact of the prosecution's failure to correct the false testimony; the right to due process is particularly undermined when the prosecution capitalizes on the use of false testimony because such conduct buttresses the deceptive use of the untruthful testimony. *Smith*, 498 Mich at 476.

At trial, during the prosecutor's direct examination of Sergeant Wight, the prosecutor elicited testimony that Rodriguez's cell phone records indicated that during the time period preceding his disappearance, he exchanged text messages with a phone number ending in 0050 in which the messages referenced the names of both Moose and Drew, which were Alkotiat's and defendant's nicknames. At issue here is the following exchange:

> *Q*. The name on that account was not Hameer Alkotiat; is that true?
>
> *A*. That is correct.
>
> *Q*. And it was Andrew Czarnecki?
>
> *A*. That is correct.
>
> *Q*. But you did have this number making calls—or making text messages to the victim's phone identifying as Drew and Moose?
>
> *A*. That is correct.

Defendant argues on appeal that Sergeant Wight falsely testified that the name on the account for the 0050 number was his name, and the prosecutor failed to correct this false testimony. Although the transcript does reflect that Sergeant Wight identified defendant as the person whose name was on the account, we question the accuracy of the transcription considering the surrounding content. In particular, immediately after apparently confirming that the phone number *did* belong to defendant, the prosecutor nonetheless asked Sergeant Wight "[b]ut you did have this number making calls—or making text messages to the victim's phone identifying as Drew and Moose?" Regardless, after the prosecutor elicited this testimony, she elicited other testimony indicating (1) that the 0050 number was in fact registered to a different person, and (2) that a different number, one ending in 5322, belonged to defendant, and that it was the 5322 number that was used to track defendant's cell phone activity during the relevant time period. Moreover, during closing argument, the prosecutor did not highlight or capitalize the allegedly false testimony by Sergeant Wight that the 0050 number was registered to defendant, but instead stated that this phone number was registered to a different person. Therefore, to the extent that Sergeant Wight's isolated response was false, the record clearly reflects that the prosecutor did not deliberately and knowingly seek to mislead the jury into believing that the 0050 number was for a phone registered to defendant in an attempt to obtain a tainted conviction. *Smith*, 498 Mich at 475-476. Indeed, the prosecutor elicited evidence to the contrary and argued otherwise in closing argument. Therefore, defendant has not demonstrated that the prosecutor's conduct with respect to Sergeant Wight's testimony violated due process.

We also reject defendant's claim of ineffective assistance of counsel related to this issue. Even if an objection by defense counsel may have been appropriate, considering the other evidence introduced by the prosecutor indicating that the 0050 number was in fact for a phone registered to another person, and that the prosecutor argued likewise in closing argument, there is no reasonable probability that defendant was prejudiced by trial counsel's failure to object to Sergeant Wight's isolated testimony.

## D.  CUMULATIVE ERROR

Finally, defendant argues that the cumulative impact of many errors in this case warrants reversal of his convictions.  We disagree.  As this Court observed in *People v Knapp*, 244 Mich App 361, 387; 624 NW2d 227 (2001), we review a defendant's claim of cumulative error to determine if the cumulative effect of the claimed errors were seriously prejudicial to deny the defendant a fair trial.  In this case, having rejected defendant's various claims of error, there can be no cumulative effect that operated to deny defendant a fair trial.  Therefore, defendant's claim that the cumulative effect of multiple errors undermined his right to a fair trial is unavailing.

Affirmed.


/s/ Colleen A. O'Brien
/s/ Cynthia Diane Stephens
/s/ Mark T. Boonstra